[Cite as *State v. Sawyer*, 2026-Ohio-1398.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
GREENE COUNTY

| | |
|---|---|
| STATE OF OHIO | : |
| | :    C.A. No. 2025-CA-37 |
|      Appellee | : |
| | :    Trial Court Case No. 2024 CR 0423 |
| v. | : |
| | :    (Criminal Appeal from Common Pleas |
| WILLIAM J. SAWYER | :    Court) |
| | : |
|      Appellant | :    **FINAL JUDGMENT ENTRY &** |
| | :    **OPINION** |

. . . . . . . . . . .

Pursuant to the opinion of this court rendered on April 17, 2026, the judgment of the trial court is affirmed.

Costs to be paid as stated in App.R. 24.

Pursuant to Ohio App.R. 30(A), the clerk of the court of appeals shall immediately serve notice of this judgment upon all parties and make a note in the docket of the service. Additionally, pursuant to App.R. 27, the clerk of the court of appeals shall send a certified copy of this judgment, which constitutes a mandate, to the clerk of the trial court and note the service on the appellate docket.


For the court,


_____
CHRISTOPHER B. EPLEY, JUDGE

HUFFMAN, J., and HANSEMAN, J., concur.

KRISTIN L. ARNOLD, Attorney for Appellant
MEGAN A. HAMMOND, Attorney for Appellee

EPLEY, J.

{¶ 1} After being bound over from juvenile court, William J. Sawyer pleaded guilty in the Greene County Court of Common Pleas, General Division, to two counts of rape, three counts of pandering sexually-oriented material involving a minor, and two counts of illegal use of a minor in nudity-oriented material or performance. The trial court imposed the agreed sentence of four to six years in prison and designated him a Tier III sex offender.

{¶ 2} Sawyer appeals from his convictions, claiming that the juvenile division erred in transferring jurisdiction to the general division for prosecution as an adult and that the trial court erred in denying his motion to suppress. For the following reasons, the trial court's judgment is affirmed.

**I. Facts and Procedural History**

{¶ 3} According to Detective Christoper Sticka's testimony at the motion to suppress hearing, the investigation into Sawyer began after the Greene County Sheriff's Office received a referral from the Internet Crimes Against Children ("ICAC") task force. ICAC provided an IP address that had been used to upload three photos and one video showing a prepubescent child in a state of nudity and involved in a sexual act.

{¶ 4} The sheriff's office quickly suspected Sawyer, then 17 years old, of uploading the unlawful material. Detectives determined that the IP address was associated with Sawyer's residence, and they obtained a search warrant for the home. When detectives

went to the house on February 23, 2024, Sawyer's parents identified a cell phone number that had been included in the ICAC report as belonging to Sawyer.

{¶ 5} Sawyer's father agreed to allow Sticka to speak with his son, and he accompanied the detective to Sawyer's high school to get Sawyer out of school. After Sticka introduced himself to Sawyer, Sawyer agreed to go with deputies to the sheriff's office to speak with Sticka. Upon arrival, Sawyer was placed in an interview room. Sawyer's father also went to the sheriff's office, and after agreeing to allow Sticka to speak with Sawyer privately, he waited in the lobby.

{¶ 6} Before questioning Sawyer, Detective Sticka informed Sawyer of his *Miranda* rights using a juvenile pre-interview form. Sawyer orally indicated that he understood his rights, placed a checkmark after each right, and signed the form. He did not state that he wanted a lawyer. Detective Sticka proceeded to interview Sawyer, during which Sawyer admitted to uploading the obscene material and committing sexual assaults over several years against a relative, who was then 12 years old. Sawyer was arrested following the interview and taken to the Greene County Juvenile Detention Center.

{¶ 7} Two days later, Sawyer was charged by complaint in juvenile court with two counts of rape, both felonies of the first degree if committed by an adult. On March 4, 2024, the State filed a motion for the juvenile court to relinquish jurisdiction, to transfer jurisdiction to the general division for prosecution as an adult, and to schedule a preliminary hearing. Following a hearing on April 4, 2024, the juvenile court found that there was sufficient evidence to support the finding of probable cause to believe that Sawyer had committed two counts of rape. The court ordered an investigation, including a psychological evaluation, and scheduled an amenability hearing. At defense counsel's request, a second evaluation was conducted. The court held the amenability hearing on June 28, 2024. On July 8, 2024, after

considering the evidence and weighing the statutory factors, the juvenile court granted the State's motion to relinquish jurisdiction and transferred the action to the general division for the prosecution of Sawyer as an adult.

{¶ 8} Later that month, Sawyer was indicted on two counts of rape, three counts of pandering sexually-oriented material involving a minor, and two counts of illegal use of a minor in nudity-oriented material or performance. He moved to suppress (1) evidence seized from his residence on February 23, 2024 pursuant to a search warrant, (2) evidence seized on February 23, 2024 from his Discord account, (3) statements he made as a result of his arrest and interrogation, and (4) evidence seized from his phone on or about March 4, 2024. Because the trial judge had signed the residential search warrant, the matter was transferred to another judge to resolve the suppression issue only. After a hearing, the motion to suppress was denied in its entirety.

{¶ 9} Sawyer's jury trial was scheduled for May 5, 2025. On that date, however, he entered a guilty plea to the offenses charged in the indictment. In exchange for the plea, the State agreed to a mandatory prison term of four to six years. Sawyer acknowledged that he would be required to register for life as a Tier III sex offender. The trial court accepted Sawyer's plea and sentenced him as agreed by the parties.

{¶ 10} Sawyer appeals from his convictions, raising two assignments of error. We address them in reverse order

## II. Motion to Suppress

{¶ 11} In his second assignment of error, Sawyer challenges the trial court's denial of his motion to suppress on two grounds. First, he claims that the statements he made during his interrogation on February 23, 2024, were involuntary and obtained in violation of his *Miranda* rights. Second, he asserts that the evidence obtained from his residence and

4

Discord account should have been suppressed, because the search warrants authorizing the searches were not supported by probable cause and the warrants failed to establish a connection between the searches and the alleged criminal conduct. The State responds that by pleading guilty, Sawyer waived any challenge to the suppression ruling. We agree with the State.

{¶ 12} "The plea of guilty is a complete admission of the defendant's guilt." Crim.R. 11(B)(1). "When a criminal defendant has solemnly admitted in open court that he is in fact guilty of the offense with which he is charged, he may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea." *State v. Spates*, 64 Ohio St.3d 269, 272 (1992); *State v. Coffman*, 2021-Ohio-1601, ¶ 27 (2d Dist.). Consequently, a guilty plea waives all appealable errors, except to the extent that the errors precluded the defendant from knowingly, intelligently, and voluntarily entering his or her guilty plea. *Coffman* at ¶ 27*; State v. Rogan*, 2025-Ohio-2468, ¶ 11 (2d Dist.). Sawyer does not claim that his guilty plea was not knowing, intelligent, and voluntary. Consequently, he waived his right to challenge the trial court's ruling on his motion to suppress when he entered his guilty plea.

{¶ 13} Sawyer's second assignment of error is overruled.

### III. Amenability Determination

{¶ 14} In his first assignment of error, Sawyer claims that the juvenile court abused its discretion by ordering a discretionary bindover despite evidence demonstrating his amenability to rehabilitation within the juvenile system.

### A. Waiver

{¶ 15} Before turning to the merits of Sawyer's argument, we note that the Fourth District has held that a juvenile's guilty plea after being bound over to adult court waives the

5

juvenile's ability to contest the juvenile court's determination regarding amenability. *See State v. Moore*, 2022-Ohio-460 (4th Dist.) (guilty plea waived all non-jurisdictional errors in the bindover proceedings, including alleged errors regarding amenability). The Seventh District's discussion of waiver in *State v. Zarlengo*, 2021-Ohio-4631 (7th Dist.), suggests a similar approach. In contrast, the Eighth and Sixth Districts have held a guilty plea in the general division does not preclude an appeal of the juvenile court's amenability determination. *See, e.g.*, *State v. Coleman*, 2025-Ohio-773, ¶ 42-44 (6th Dist.); *State v. D.T.*, 2024-Ohio-4482, ¶ 76 (8th Dist.) (guilty plea did not waive competency or amenability issues on appeal). The Ohio Supreme Court has accepted the State's appeal from the Eighth District's ruling in *D.T.,* and that appeal remains pending.

{¶ 16} In *State v. Bryant*, 2024-Ohio-1192, we addressed Bryant's argument that the juvenile court had abused its discretion when it transferred his case to adult court even though he had pleaded guilty to aggravated robbery and assault. In that case, however, the State did not assert on appeal that Bryant had waived his argument regarding amenability by pleading guilty. We did not opine in *Bryant*—nor have we opined in any other case—on whether a guilty plea waives the ability to challenge the juvenile court's determination of amenability on appeal.

{¶ 17} Here, as in *Bryant*, the State has not argued that Sawyer waived his ability to contest the juvenile court's determination on amenability. Given that the State expressly raised waiver with respect to Sawyer's suppression argument, we infer that the State chose not to raise a waiver argument as to the amenability issue. We will not make the argument for the State. *Accord Eddy v. Farmers Property Cas. Ins. Co.*, 2026-Ohio-626, ¶ 41 (under the party presentation rule, an appellate court should ordinarily decide cases based on the issues raised by the parties). Accordingly, we now turn to Sawyer's claim that the juvenile

6

court abused its discretion when it determined that he was not amenable to rehabilitation in the juvenile system and transferred his case to the general division.

## B. Review of Amenability Determination

{¶ 18} Juvenile courts have exclusive jurisdiction over children alleged to be delinquent for committing acts that would constitute a crime if committed by an adult. *State v. Peaks*, 2025-Ohio-2707, ¶ 38 (2d Dist.). However, under certain circumstances, the juvenile court may—and in some cases, must—transfer jurisdiction to the appropriate adult court for criminal prosecution. *In re D.M.S.*, 2021-Ohio-1214, ¶ 16 (2d Dist.); *State v. Ferguson*, 2017-Ohio-7930, ¶ 25 (2d Dist.) ("Two types of transfer exist under Ohio's juvenile justice system: discretionary and mandatory."). Whether a juvenile offender is subject to mandatory or discretionary transfer "depends on such factors as the nature of the offense, the age of the child, and the child's prior criminal history, if any." *Steele v. Harris*, 2020-Ohio-5480, ¶ 10. Sawyer's case was transferred to the general division under R.C. 2152.12(B), which governs discretionary transfer.

{¶ 19} Under the discretionary bindover provision, after a complaint has been filed alleging that a child is a delinquent child by reason of committing one or more acts that would be a felony offense if committed by an adult, the juvenile court may transfer the case if it finds all of the following: (1) the child was 14 years of age or older when the charged act occurred; (2) there is probable cause to believe that the child committed the act; and (3) the child is not amenable to care or rehabilitation within the juvenile system, and the safety of the community may require that the child be subject to adult sanctions. R.C. 2152.12(B)(1) through (3). Sawyer does not dispute that he was older than 14 years of age when the alleged rapes occurred, and he does not contest the trial court's determination that there was probable cause to believe that he had committed the rapes.

7

{¶ 20} If probable cause is established, and after determining that the child is at least 14 years old, the juvenile court must "order an investigation into the child's social history, education, family situation, and any other factor bearing on whether the child is amenable to juvenile rehabilitation, including a mental examination of the child by a public or private agency or a person qualified to make the examination." R.C. 2152.12(C); *see also* Juv.R. 30(C). After the investigation is completed, the juvenile court must hold an amenability hearing to determine whether to transfer jurisdiction. Juv.R. 30(C).

{¶ 21} In determining whether to transfer the child's case under the discretionary bindover provision, the juvenile court must consider the following factors and any other relevant factors in favor of a transfer:

(1) The victim of the act charged suffered physical or psychological harm, or serious economic harm, as a result of the alleged act.

(2) The physical or psychological harm suffered by the victim due to the alleged act of the child was exacerbated because of the physical or psychological vulnerability or the age of the victim.

(3) The child's relationship with the victim facilitated the act charged.

(4) The child allegedly committed the act charged for hire or as a part of a gang or other organized criminal activity.

(5) The child had a firearm on or about the child's person or under the child's control at the time of the act charged, the act charged is not a violation of section 2923.12 of the Revised Code, and the child, during the commission of the act charged, allegedly used or displayed the firearm, brandished the firearm, or indicated that the child possessed a firearm.

(6) At the time of the act charged, the child was awaiting adjudication or disposition as a delinquent child, was under a community control sanction, or was on parole for a prior delinquent child adjudication or conviction.

(7) The results of any previous juvenile sanctions and programs indicate that rehabilitation of the child will not occur in the juvenile system.

(8) The child is emotionally, physically, or psychologically mature enough for the transfer.

(9) There is not sufficient time to rehabilitate the child within the juvenile system.

R.C. 2152.12(D).

{¶ 22} The juvenile court must also consider factors militating against the transfer of the youth, such as:

(1) The victim induced or facilitated the act charged.

(2) The child acted under provocation in allegedly committing the act charged.

(3) The child was not the principal actor in the act charged, or, at the time of the act charged, the child was under the negative influence or coercion of another person.

(4) The child did not cause physical harm to any person or property, or have reasonable cause to believe that harm of that nature would occur, in allegedly committing the act charged.

(5) The child previously has not been adjudicated a delinquent child.

(6) The child is not emotionally, physically, or psychologically mature enough for the transfer.

(7) The child has a mental illness or intellectual disability.

(8) There is sufficient time to rehabilitate the child within the juvenile system and the level of security available in the juvenile system provides a reasonable assurance of public safety.

R.C. 2152.12(E).

**{¶ 23}** The juvenile court is not required to resolve every factor against the juvenile so long as the totality of the evidence supports a finding that the juvenile is not amenable to treatment. *Bryant*, 2024-Ohio-1192, at ¶ 16 (2d Dist.); *State v. Watson*, 47 Ohio St.3d 93, 95 (1989). Because the statutory scheme does not dictate how much weight should be given to any specific factor, the ultimate decision is within the juvenile court's discretion. *Bryant* at ¶ 16; *Watson* at 95.

**{¶ 24}** "[A]n amenability hearing is a broad assessment of individual circumstances and is inherently individualized and fact-based. Thus, a juvenile court's determination regarding a child's amenability to rehabilitation in the juvenile system is reviewed by an appellate court under an abuse-of-discretion standard." *In re M.P.*, 2010-Ohio-599, ¶ 14.

**{¶ 25}** At Sawyer's amenability hearing, the State presented the testimony of Captain Kelly Moore of the Greene County Sheriff's Office, who spoke with the victim and observed his forensic interview at Michael's House on February 23, 2024, and Dr. Carla Dreyer, who conducted the first psychological assessment of Sawyer. Sawyer's counsel called four witnesses: (1) Tony Miller, Director of Detention for the Greene County Juvenile Detention Center; (2) Dr. Daniel Hrinko, who conducted the second psychological assessment of Sawyer; (3) Rex Fent, a juvenile probation officer for the Clark County Juvenile Court; and (4) the victim's father (Sawyer's brother). The court also admitted into evidence the bindover evaluation reports of Drs. Dreyer and Hrinko, their curricula vitae, Fent's Juvenile Sexual

10

Offending Counselor Certification Program certificate, Sawyer's report card for school year 2023-2024, and the guardian ad litem report.

{¶ 26} The juvenile court's written judgment entry made findings on each of the factors to be considered in R.C. 2152.12(D) and (E). It found that the factors in R.C. 2152.12(D)(1), (2), (3), (8), and (9) weighed in favor of transfer and the factor in 2152.12(E)(5) weighed against transfer. After weighing the relevant factors, the court concluded that the factors supported transferring Sawyer's case to the adult division and that there was not sufficient time in which rehabilitate Sawyer with a reasonable assurance of public safety. The record supports the trial court's conclusions.

{¶ 27} The evidence at the amenability hearing reflected that the kinship relationship between the victim and Sawyer was nephew/uncle, although the victim's father described the relationship as more like brothers. The victim began living in Sawyer's household when he was five years old and Sawyer was ten years old. Sawyer reported that the abuse began soon after and continued until Sawyer's arrest. The abuse involved fellatio, an attempted anal penetration, and some touching. The victim told Sawyer that the attempted penetration was painful. During his evaluation with Dr. Dreyer, Sawyer informed her that he was approximately 6'4" tall and weighed 327 pounds. He had not previously been adjudicated a delinquent child.

{¶ 28} Captain Moore, the guardian ad litem ("GAL"), and the victim's father each provided evidence related to the effect of Sawyer's actions on the victim. On February 23, 2024, Moore spoke with the victim in a police vehicle for approximately 30-40 minutes prior to taking him to Michael's House. The victim was "chatty" and "inquisitive." During the forensic interview at Michael's House, which Moore observed, the victim became "emotional," "anxious," "tearful," and "upset" when the topic of Sawyer's charges was

11

discussed. When the victim learned that Sawyer had pretended to be someone else and was the person who had allegedly blackmailed him for sexual photos, the victim became "emotionally distraught" and cried.

{¶ 29} The guardian ad litem's report stated, without explanation, that it was "unknown" whether the victim was harmed and whether the harm was exacerbated by the victim's age. The GAL concluded that Sawyer's relationship with the victim had facilitated the offense.

{¶ 30} The victim's father testified that he had spoken with his child about the forensic interview, and the victim was "not overjoyed" and was more confused. The child expressed to his father that he was hurt about what had taken place but that it was not a "big deal." The victim continued to be involved with sports and other activities. The father had not noticed any decline in the child's schooling, behavior, involvement in activities, or mood. The victim was mad at Sawyer, but he missed him and wanted him to come home. Although children services recommended to the victim's father that the child receive counseling, the victim did not want to participate in counseling and the victim's father was not requiring him to do so.

{¶ 31} Based on the testimony from Moore and the victim's father, as well as the GAL's report, the trial court reasonably concluded that the victim suffered physical or psychological harm as a result of Sawyer's conduct, that the harm was exacerbated by the age of the victim, and that the victim's relationship to Sawyer facilitated the offense.

{¶ 32} The testimony of Drs. Dreyer and Hrinko focused primarily on whether Sawyer was "emotionally, physically, or psychologically mature enough for the transfer" and whether there was sufficient time to rehabilitate him within the juvenile system. Dr. Dreyer reviewed the police reports and spoke with Sawyer's parents, the prosecutor, and defense counsel. She requested but did not receive school records and juvenile detention records. She spoke

with Sawyer at the detention center for approximately an hour. Dr. Hrinko reviewed the police reports and talked with defense counsel prior to meeting with Sawyer for two-and-a-half hours. Before writing his report, he also interviewed Sawyer's father to gain historical info and reviewed Sawyer's school records and Dr. Dreyer's report.

{¶ 33} Both Dr. Dreyer and Dr. Hrinko obtained information about Sawyer's mental status, his family background and social relationships, his medical and mental health history, his education background, his employment history, his substance use, his sexual history, and the conduct related to his charges, including his pedophilic interests. Sawyer talked openly and candidly about his sexual interests and urges and the various forms of manipulation he used to get victims to comply. Both experts completed risk assessments regarding Sawyer; Dr. Dreyer employed the HCR-20v3 assessment and Dr. Hrinko used the Structured Assessment of Violence Risk in Youth (SAVRY). Both also administered psychological assessments with Dr. Dreyer using the Personality Assessment Inventory (PAI) and Dr. Hrinko using the Jesness Inventory-Revised (JI-R).

{¶ 34} The experts' testimony and reports supported the conclusion that Sawyer was physically, emotionally, and psychologically mature enough for the transfer. The guardian ad litem agreed that Sawyer was physically mature enough, but he concluded that Sawyer was not emotionally and psychologically mature enough for transfer. The GAL report provided no details to explain his conclusion. The trial court did not abuse its discretion by agreeing with Dr. Dreyer's and Hrinko's assessments regarding Sawyer's maturity.

{¶ 35} The greater debate concerned whether there was sufficient time to rehabilitate Sawyer within the juvenile system. Dr. Dreyer concluded that there was not. At the time of her evaluation, Sawyer was 18 years and one month old, allowing nearly three years for treatment in the juvenile system, although the time until sentencing would delay the onset of

13

treatment. She emphasized that Sawyer was both a contact and no-contact offender, that Sawyer's paraphilic interests would be difficult to change, and that the typical programming in juvenile court was not equipped to handle it. She considered outpatient treatment to be "wholly inappropriate" due to the risk that he posed to the community. Residential treatment would be difficult because most facilities did not want someone over 18 years old and there were other children in the programs that he might victimize. Dr. Dreyer stated that the Department of Youth Services had treatment options, but they were not sufficient to address his paraphilic disorder. She indicated that Sawyer's needs could be met in the adult system.

{¶ 36} In contrast, Dr. Hrinko concluded that Sawyer could be rehabilitated in the juvenile system. He indicated that research has shown that the benefits from treatment tend to come most dramatically after the offender has accepted responsibility and developed empathy toward the victim and that, commonly, several months are spent getting past that denial and resistance to treatment. During his evaluation, Sawyer made several comments displaying a concern for how his actions had affected those around him. Dr. Hrinko expected that once Sawyer began treatment, he would make relatively rapid progress and not spend months dealing with denial. Dr. Hrinko stated that Sawyer's JI-R results were similar to those who had been successful in treatment, and Sawyer had expressed a desire to "fix this." He told the court that sexual pedophilia is a treatable mental health disorder, and he opined that there was enough time and resources within the juvenile system for Sawyer to have substantial improvement. He believed there were several well-known adolescent sex offender treatment programs available in Ohio with typical stays between 18 months and two years with reasonably good rates of success. On cross-examination, Dr. Hrinko acknowledged that he had not researched the availability of treatment for sex offenders for

many years and had only a cursory familiarity with what treatment facilities exist in Ohio for juvenile sex offenders.

{¶ 37} The GAL also believed that there was time to rehabilitate Sawyer.

{¶ 38} Miller testified about Sawyer's detention at the juvenile detention center. Sawyer had been in detention for approximately 140 days, and Miller saw him almost daily, usually three to four times per day, including at breakfast and during schooling or other activities. Sawyer's biggest program was school, but he also participated in mental health counseling once every two weeks or at his request. Sawyer's behavior had been fine with no disciplinary issues (except for one issue related to contraband that was determined not to be his). Miller stated that Sawyer had no special accommodation to keep him away from other youths. He explained that Sawyer had an individual room and was otherwise with a group; Sawyer was not around other youths by himself.

{¶ 39} Fent described the program that Clark County uses to address juvenile sex cases. While Fent indicated that the program was highly effective, it is limited to children in Clark County. Of more general relevance, Fent indicated that three years would be sufficient to supervise most children with a sexually oriented offense, and he believed that the juvenile system has better resources and is more geared to treat sexually oriented offenses than the adult system. He acknowledged, however, that residential facilities can be difficult to find for juvenile offenders after 18 years old. Fent did not have experience with children with paraphilic disorders.

{¶ 40} Focusing on the testimony of Drs. Dreyer and Hrinko, the trial court thoroughly discussed the expert's respective findings and analyses and found that, "[g]iven the treatment options, paraphilic disorder, Sawyer's age and complexity of treatment, the court is not confident that treatment can begin and conclude under the supervision of the juvenile

15

justice system." We find no abuse of discretion in the court's conclusion that the factor stated in R.C. 2151.12(D)(9) weighed in favor of transfer.

{¶ 41} Finally, the trial court weighed the factors for and against transfer and concluded that the factors weighed in favor of transfer and there was not sufficient time to rehabilitate Sawyer within the juvenile system and with a reasonable assurance of public safety. Upon review of the evidence from the amenability hearing, we find no abuse of discretion in the trial court's conclusion. Although the trial court was presented with evidence from which it could have reached a different determination, its conclusion regarding Sawyer's amenability to rehabilitation in the juvenile system was reasonable.

{¶ 42} Sawyer's first assignment of error is overruled.

### IV. Conclusion

{¶ 43} The trial court's judgment is affirmed.

. . . . . . . . . . . . .

HUFFMAN, J., and HANSEMAN, J., concur.