[Cite as *State v. Taylor*, 2024-Ohio-5094.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                          :

    Plaintiff-Appellee,           :           Nos. 113385, 113386, and 113387

    v.                             :

ANTHONY D. TAYLOR, JR.,                  :

    Defendant-Appellant.          :

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** October 24, 2024

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case Nos. CR-23-683391-A, CR-23-678331-A, and CR-23-678332-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Yasmine M. Hasan, Assistant Prosecuting Attorney, *for appellee.*

Elizabeth Miller, Ohio Public Defender, and Charlyn Bohland, Assistant State Public Defender, *for appellant.*

EMANUELLA D. GROVES, J.:

{¶ 1} In this consolidated appeal, defendant-appellant, Anthony D. Taylor, Jr. ("Taylor"), appeals his convictions after being transferred, or bound over, from the Juvenile Division ("juvenile court") to the General Division of the Cuyahoga

County Court of Common Pleas ("general division" or "adult court") and entering guilty pleas. Taylor argues that his convictions and bindover should be reversed and remanded to the juvenile court because the juvenile court (1) abused its discretion when it determined that he was not amenable to treatment in the juvenile court system and (2) committed plain error when it transferred misdemeanor offenses for adult criminal prosecution and accepted waivers premised on a misstatement of law. Upon review, we affirm Taylor's convictions.

## I.    Facts and Procedural History

{¶ 2} In October 2022, the State filed two delinquency complaints against Taylor (d.o.b., October 9, 2006) in juvenile court, alleging that Taylor committed acts that amounted to criminal offenses had he been an adult.

{¶ 3} The first complaint, initiating Cuyahoga Juvenile Division No. DL22110100, charged Taylor with nine counts arising from events that occurred in September and October 2022. Count 1 charged Taylor with aggravated robbery, a first-degree felony. Count 2 charged him with kidnapping, a first-degree felony. Counts 3 through 5 charged Taylor with robbery, second- or third-degree felonies, respectively. Counts 6 and 8 charged him with having weapons while under disability, third-degree felonies. Count 7 charged him with theft, a first-degree misdemeanor. Count 9 charged Taylor with carrying a concealed weapon, a fourth-degree felony, with a furthermore clause claiming that either the firearm was loaded or Taylor had ammunition ready at hand. Counts 1 through 5 carried one- and three-

year firearm specifications, while Counts 6, 8, and 9 carried forfeiture-of-a-weapon specifications.

{¶ 4} The second complaint, initiating Cuyahoga Juvenile Division No. DL22110896, charged Taylor with eight counts stemming from an incident that occurred in July 2022. Counts 1 through 5 charged Taylor with felonious assault, second-degree felonies. Count 6 charged Taylor with discharge of a firearm on or near prohibited premises, a third-degree felony. Count 7 charged him with carrying a concealed weapon, a fourth-degree felony, with a furthermore clause claiming that either the firearm was loaded or Taylor had ammunition ready at hand. Count 8 charged him with aggravated riot, a fourth-degree felony. Counts 1 through 6 and 8 carried one- and three-year firearm specifications.

{¶ 5} In each case, the State moved for orders to relinquish jurisdiction for the purpose of criminal prosecution pursuant to R.C. 2152.10(B) and for preliminary hearings. Taylor denied the complaints' allegations and objected to the motions for discretionary transfer.

{¶ 6} The matters were set for a probable cause hearing on December 5, 2022, at which time Taylor waived his right to the hearing and stipulated to probable cause. After the juvenile court engaged in a colloquy with Taylor regarding the charges at issue and the effect of waiving the probable cause hearing, the juvenile court accepted Taylor's waiver and found that it was knowingly, intelligently, and voluntarily made. The State entered the following exhibits, absent objection: an operability report for a firearm that was recovered with Taylor, consistent with the

description of the firearm used in the aggravated robbery associated with Cuyahoga Juvenile Division No. DL22110100, and five screen captures from surveillance footage of the felonious assault shooting associated with Cuyahoga Juvenile Division No. DL22110896, one of which Taylor identified himself in. The juvenile court ordered a full investigation into Taylor's social history, education, family situation, and any other relevant amenability factor and referred Taylor to the juvenile court's diagnostic clinic for a psychological evaluation.

{¶ 7} Lynn Williams, Ph.D. ("Dr. Williams"), a forensic psychologist from the juvenile court's diagnostic clinic, subsequently evaluated Taylor and prepared a report. Dr. Williams' report included details regarding Taylor's family, academic, developmental, and social histories. Of note, Taylor primarily lived with his mother because he wanted more freedom, although he reported "do[ing] better" living with his father, who provided a more structured environment and prevented him from getting into trouble. Taylor had a history of absences without permission and probation violations, at which time Taylor and his mother may have been homeless. Taylor had been a victim of domestic violence, held at gunpoint at a young age during a home invasion, and a witness to domestic violence between his mother and her boyfriends. Taylor denied gang involvement and reported that multiple friends died from gun violence. Taylor had varying grades, was involved in three fights, and was expelled twice. Taylor had some history of mental diagnoses or intervention in the community with outpatient counseling, reported anger issues, was diagnosed with posttraumatic stress disorder and attention deficit hyperactivity disorder, and

had exhibited symptoms consistent with depression and anxiety. Taylor also reported marijuana use.

{¶ 8} In the report, Dr. Williams further noted that this matter was Taylor's third involvement with the juvenile court system. Taylor previously completed a gun prevention program and 32 of 40 required community service hours. Dr. Williams noted that during Taylor's two prior involvements with the juvenile court, the following issues were encountered: two "unsuccessful" home detentions, i.e., refusal to report caused by lack of transportation and leaving without permission because his mother was being assaulted in the home; several "unsuccessful" efforts to engage Taylor's family in multisystemic therapy; and limited treatment in the community along with two referrals that were not initiated.

{¶ 9} Dr. Williams reported that Taylor currently had "no major issues" in the juvenile detention center. Dr. Williams noted that the juvenile detention center's staff indicated that Taylor could get "mouthy" at times but was not physically confrontational. The staff further indicated that Taylor was "able to manage interactions with negative peers." Dr. Williams reported that Taylor demonstrated mostly positive behaviors at the juvenile detention center and was involved with mental health services at the juvenile detention center.

{¶ 10} Dr. Williams' report also included results from Taylor's intellectual and psychological testing results. Taylor tested "within the low average category of cognitive ability" with an IQ of 87 in the 19th percentile. Dr. Williams noted that Taylor's "cognitive abilities based on the current scores [were] in the outside range

of what [was] consistent with intellectual deficiency" and that "[m]ost youth with similar IQ scores . . . would be able to complete high school or a vocational program." Taylor was reading at a seventh-grade skill level, scoring in the 23rd percentile, and most likely did not meet the criteria for functional illiteracy. Dr. Williams' diagnostic impressions included diagnoses of conduct disorder with adolescent onset, due to Taylor's "history of patterns of delinquency"; unspecified trauma and stressor-related disorder, due to endorsements of some anxiety, depression, and traumatic stress; and severe cannabis use disorder, which was in early remission due to his detention. Dr. Williams determined that Taylor was not intellectually disabled and did not suffer from severe psychiatric disturbance. Dr. Williams further concluded that Taylor could benefit from cognitive behavioral anger management programming and behavioral health intervention in the interest of attempting to reduce recidivism.

{¶ 11} Finally, Dr. Williams reported Taylor's scores on "three key transfer factors": (1) risk for violence, (2) sophistication maturity, and (3) treatment amenability. Taylor's risk of future violence results indicated a moderate estimate for future antisocial or violent acts due to "some patterns of violence." These results were based on Taylor's historical risk factors, such as school fights and inconsistent behaviors within the school setting and while on probation, and current allegations of criminal behavior, which involved acts of violence involving a firearm.

{¶ 12} Second, Taylor scored in the high range, the 91st percentile, for sophistication-maturity, reflecting that he had begun to develop decision-making

skills and a sense of himself as an independent person. Dr. Williams noted, "This construct can have two different meanings in the juvenile justice population. These skills can be used toward prosocial goals as a favorable and positive attribute; however, when these attributes are used for delinquent or criminogenic purposes, sophistication and maturity become a distinct liability." Ultimately, Dr. Williams concluded that Taylor was using his sophistication and maturity in primarily antisocial ways considering his current offenses.

{¶ 13} Third, Taylor scored in the middle range for treatment amenability, the 46th percentile, meaning that he had some favorable characteristics and others that were not. Dr. Williams explained:

> He has had some difficulty adhering consistently to rules and expectations while on probation. However, there were some positive instances and he completed 32 of his required 40 hours of community service. He completed a gun intervention program. He has had limited treatment in the community and referrals were mentioned . . . but two were not initiated. He acquired the current charges while on probation. [Taylor's] motivation for additional interventions cannot be determined, as he has improved his behaviors since being in the [juvenile detention center] but has been unable to be consistent in the community. The family was assumed to be homeless for a period of time and efforts to engage [Taylor's mother] in [multisystemic therapy] were unsuccessful. The degree to which [Taylor's] behavioral issues are impacted by a lack of consistent family involvement (while he was living at his mother's home) is unclear. [Taylor's] father is committed to engaging in any required programming.

With these considerations in mind, Dr. Williams advised that there was "a moderate estimate that [Taylor] could obtain a positive treatment outcome."

{¶ 14} On January 30, 2023, the juvenile court conducted an amenability hearing to determine whether Taylor's cases should be transferred to the general

division for criminal prosecution. As a preliminary matter, the parties stipulated to Dr. Williams' report. The State then called its witness: Cleveland Police Homicide Detective Jonathan M. Dayton ("Detective Dayton").

{¶ 15} Detective Dayton testified that he was assigned to the homicide of M.W., a 14-year-old boy who was fatally shot in July 2022. Detective Dayton explained that his squad was dispatched to the scene, canvassed the area, conducted interviews, and collected evidence, including surveillance footage that captured "the entire incident, for the most part." (01/30/23, tr. 10.) Detective Dayton advised that he reviewed this footage and offered testimony about the contents of three videos, which were marked as exhibits. As the videos were played, Detective Dayton described "a large group of people engulfed in a fight"; pointed out Taylor and M.W., both of whom he identified by their clothing; and explained the events surrounding M.W.'s death, which involved shots being fired by multiple people throughout a large courtyard located in the middle of a housing complex on Detroit Avenue. *Id.* at 14.

{¶ 16} In one of the videos, Detective Dayton explained that "just moments, like literally seconds before [M.W. was] shot," Taylor can be seen producing a handgun and firing three shots in the direction of an individual who fired shots in the air. *Id.* at 20-22. Seven minutes into another video, depicting the events that transpired after M.W. was shot, Taylor can be seen firing gunshots from one area of the courtyard and across Detroit Avenue, in the direction of a group of people involved in the incident, a car, and an occupied apartment building. *Id.* at 24-25.

Detective Dayton explained that a "gun battle" ensued and, while it was "hard to say," he did not believe the group across Detroit Avenue began firing prior to Taylor firing at them. *Id*. at 25-26.

{¶ 17} Detective Dayton advised that Taylor later identified himself in a still from the surveillance footage during an interview. Detective Dayton further testified that Taylor did not fire the fatal shot that killed M.W. On cross-examination, Detective Dayton agreed that none of the shots fired by Taylor struck anyone.

{¶ 18} The defense then called its witness: Anthony Taylor, Sr. ("Mr. Taylor"), Taylor's father. Mr. Taylor testified that Taylor's demeanor changed "very much" since being in juvenile detention:

> [H]e talks about his future more a lot and talks about continuing to play football and boxing like he was. His attitude is improved a lot. When we talk on the phone he — you know, he's much calmer. He seems to have his head pretty on straight. He seems to have learned a big lesson by sitting in here these four months, definitely.

*Id*. at 40. Mr. Taylor believed that the programs and counseling Taylor received in juvenile detention were helping and Taylor was "learning to cope with his anger" and "just pretty much maturing." *Id*. at 41.

{¶ 19} The State then made its closing statement, explaining that Taylor was on probation for a firearms offense and had completed a gun intervention program when he committed two new violent, firearm offenses within a span of three months: an aggravated robbery and the felonious assault shooting depicted in the videos. The State argued the following:

> [W]e saw in the exhibits that he was shooting in tandem with the other shooters. One person shooting in the air, another person shooting in the air, and you have [Taylor], whelp I'm going to start shooting at you guys. His actions are a direct contribution to the death of his friend. And while he may not have fired the fatal shot, he's a contributing factor.

*Id.* at 43-44. The State then applied the facts to the statutory factors in favor of and against transfer and cited to certain portions of Dr. Williams' report before concluding that Taylor was not amenable to juvenile rehabilitation because "[he] had the opportunity to be successful while on probation and has chosen not to and has chosen to commit multiple offenses with a firearm." *Id.* at 52.

{¶ 20} In its closing statement, the defense argued that Taylor was "a follower" and he was "shooting up in the air and was not trying to actually hit anybody." *Id.* at 54. The defense also discussed the progress Taylor was making in juvenile detention:

> I see a kid that's in [juvenile detention] for four months, earning some credits towards his degree. Is he a perfect child in [juvenile detention]? No. I don't know if anybody can be in that environment, your Honor. In fact . . . he was housed in one of the housings where there's probably more problems than others, and he hasn't gotten into any fights, he's been respectful, his behavior demonstrates that he is learning.

*Id.* at 55.[1] The defense highlighted that while Taylor was in juvenile detention, he participated in recreational and behavioral management programs, received consistent family visits and mental health services, worked hard, and appeared to be motivated to complete high school. The defense argued that "these scream that

---

[1] The defense referred to a Resident Adjustment Report in its closing statements. This report was not stipulated to or otherwise offered as an exhibit at Taylor's amenability hearing and was not included in the appellate record.

[Taylor] is amenable, that he is doing better, that the system is working." *Id.* at 56-57.  The defense acknowledged that Dr. Williams' report indicated mixed treatment amenability scores but reiterated that "services ha[d] been helping him to this point, Dr. Williams opine[d] that services will help him in the future, [and] he has the support of his family . . . ." *Id.* at 62.  The defense concluded that the statutory factors weighed against transfer and requested the State's motion be denied.

{¶ 21} The juvenile court then discussed the requirements of R.C. 2151.12 and explained its weighing of the factors for and against transfer as follows:

> The whys I'm keeping it here, you know, you were 15 at the time of this offense.
>
> You have tremendous family support.  I don't think I've had a case in my years on the bench where I've had so many people come for a hearing like this.  You should consider yourself lucky no matter what the outcome is because a lot of kids sit right where you're at with no mom, no dad, no friends, no aunts, uncles, cousins, no one.  We have to appoint someone to sit with them, which is very sad.
>
> The other factor keeping your case here would be that you've been detained since October 14th in our detention center, and I agree with [defense counsel] that being in the detention center is no easy task alone to stay out of trouble.  There have [been] riots in there, there have been numerous riots that I've been made aware of, and I have not seen your name come across my desk as someone that's been involved in them.
>
> What puzzles me a little bit is, you know, did you get the message a little too late.
>
> You know, your dad testified that he's seen a change you.  I think if you think back, I think you'll remember that one of the things they teach you at the gun prevention program is that if a gun is used, someone is likely to get hurt or killed.

And that was something that you — the class you took way prior to what happened here. You know, I watched this video and . . . what I see, [Taylor], is that you had ample time to remove yourself from this crazy situation, but you chose to exacerbate it by — whether if you fired at them, above them, under the air, it didn't matter. I mean, you had all kinds of time to remove yourself from there and you chose not to, and as a result, one of your friends, as I assume, you know, you watched it right here again, you had to relive what took place.

The factors that I considered in favor of transfer, that clearly in both cases, the victim suffered physical or psychological harm.

If you had a firearm on or about your person, under your control at the time of the act charged, and during the commission of the act charged, you allegedly used, displayed, brandished the firearm and indicated possession.

At the time of the offenses, you were awaiting adjudication in 22108605, or disposition as a delinquent child or under community control, and you were on community control in 21108395 and 21111221. And by getting involved in this offense, it's clear that the results of previous juvenile sanctions and programs indicate that rehabilitation will not occur in the juvenile system.

And you are emotionally, physically, and psychologically mature enough for transfer.

Therefore, I'm going to find that there is not sufficient time to rehabilitate you in the juvenile court based on the above, the factors in favor outweigh those against transfer. And I'm going to find that you are not amenable to care and rehabilitation within the juvenile system and that the safety of the community requires subjecting you to adult sanctions.

(Cleaned up.) *Id.* at 64-67. Accordingly, the juvenile court advised that the matter was to be transferred to the general division for further proceedings.

{¶ 22} On February 2, 2023, the juvenile court issued decisions regarding Taylor's discretionary transfer in each case. Therein, the juvenile court made the following findings on the issue of amenability:

The Court finds that after a full investigation, including a mental health examination of said child made by a duly qualified person, and after full consideration of the child's prior juvenile record, family environment, school record, efforts previously made to treat and rehabilitate the child, including prior commitments to the Department of Youth Services, the nature and severity of the offense herein, the age, physical, and mental condition of the victim as effected by the matter herein, and other matters of evidence, that there are reasonable grounds to believe that the child herein **is not amenable** to care or rehabilitation within the juvenile system.

The Court further finds that the safety of the community may require that the child be subject to adult sanctions.

The Court considered the relevant factors in favor of transfer and pursuant to R.C. 2152.12(D) and makes the following findings:

1. The victim[s] of the act charged suffered physical or psychological harm, or serious economic harm, as a result of the alleged act.

3. The child's relationship with the victim facilitated the act charged.

5. The child had a firearm on or about the child's person or under the child's control at the time of the act charged, the act charged is not carrying a concealed weapon, and the child, during the commission of the act charged, allegedly used or displayed the firearm, brandished the firearm, or indicated that the child possessed a firearm.

6. At the time of the act charged, the child was awaiting adjudication for [Case Number DL2210860[5]] or disposition as a delinquent child, was under a community control sanction [in Case DL21108395 and DL21111221] or was on parole for a prior delinquent child adjudication or conviction[2].

7. The results of any previous juvenile sanctions and programs indicate that rehabilitation of the child will not occur in the juvenile system, and the child previously completed a gun intervention program.

---

[2] Both journal entries included identical findings apart from the bracketed statements contained in this section, which were included in the journal entry issued in Cuyahoga Juvenile Division No. DL22110869 but not in Cuyahoga Juvenile Division No. DL22110100.

8. The child is emotionally, physically, or psychologically mature enough for the transfer.

9. There is not sufficient time to rehabilitate the child within the juvenile system.

The Court considered the relevant factors against transfer pursuant to R.C. 2152.12(E) and makes the following findings:

1. Child was 15 years of age at the time of conduct alleged.

2. The youth has tremendous family support evidenced by the fifteen members in the court for the hearing.

3. Child has been detained in the Cuyahoga County Juvenile Detention Center since October 14, 2022, and his behavior has been appropriate.

(Emphasis in original.) (Journal Entries, 02/02/23.) The juvenile court then transferred the cases to the general division for further proceedings.

{¶ 23} In the general division, Taylor was indicted in Cuyahoga C.P. Nos. CR-23-678331 and CR-23-678332 for the same charges that were originally brought in Cuyahoga Juvenile Division Nos. DL22110896 and DL22110100. In March 2023, Taylor pled not guilty, bond was set, and he was released under court supervision with GPS monitoring. Days later, a capias was issued after Taylor removed his GPS monitor. In May 2023, Taylor was arrested with a firearm and cocaine on his person.

{¶ 24} In July 2023, the State filed another delinquency complaint against Taylor in juvenile court. The four-count complaint, initiating Cuyahoga Juvenile Division No. DL23108412, arose from his May 2023 arrest. Count 1 charged Taylor with having weapons while under disability, a third-degree felony. Count 2 charged

him with carrying a concealed weapon, a fourth-degree felony, with a furthermore clause claiming that either the firearm was loaded or Taylor had ammunition ready at hand. Counts 1 and 2 carried forfeiture-of-a-weapon specifications. Count 3 charged Taylor with drug possession, a fifth-degree felony, with a one-year firearm specification and a forfeiture of a gun in a drug case specification. Count 4 charged him with obstructing official business, a second-degree misdemeanor.

{¶ 25} The State filed a motion for an order to relinquish jurisdiction for the purpose of criminal prosecution pursuant to R.C. 2152.10(B) and for a preliminary hearing. A guardian ad litem was appointed, and a hearing was held on the motion. At the hearing, Taylor denied the complaint's allegations and waived his right to probable cause and amenability hearings after the juvenile court colloquy explaining Taylor's rights and the implications of his waivers. Taylor further waived a psychological examination. The juvenile court stated, "Based on your waivers with a full understanding of your rights and the assistance of [defense counsel], I'll find that you knowingly, intelligently, and voluntarily waived your right to a probable cause hearing and an amenability hearing, and we will prepare paperwork to transfer this case down to the general division and [the judge who has your other two cases] will receive it." (07/27/23, tr. 11.) In its decision transferring the matter to the general division, the juvenile court noted Taylor's waivers and found that he was 16 years old at the time of the alleged conduct and that there was probable cause to believe that he committed the crimes charged. (Journal Entry, 07/28/23.)

{¶ 26} In August 2023, Taylor was indicted in the general division in Cuyahoga No. CR-23-683391 for the same charges filed in the July 2023 juvenile delinquency complaint and pled not guilty. Taylor's bond was revoked in Taylor's two other general division cases, and he was housed in the juvenile detention center pending disposition.

{¶ 27} In September 2023, a change-of-plea hearing was held for all three of Taylor's general division cases. In Cuyahoga No. CR-23-678331, Taylor pled guilty to felonious assault, a second-degree felony, with a three-year firearm specification (amended Count 1) and discharge of a firearm on or near a prohibited premises, a third-degree felony (amended Count 6). In Cuyahoga No. CR-23-678332, Taylor pled guilty to robbery, a second-degree felony (amended Count 3) and having weapons while under disability, a third-degree felony, with a forfeiture-of-a-weapon specification (Count 8, as charged). In Cuyahoga No. CR-23-683391, Taylor pled guilty to having weapons while under disability, a third-degree felony (Count 1, as charged), and drug possession, a fifth-degree felony (amended Count 3), both with forfeiture-of-a-weapon specifications. In exchange for his guilty pleas in each case, the remaining counts and specifications were nolled.

{¶ 28} In October 2023, a sentencing hearing was held. The trial court heard from the State, defense counsel, Taylor, Mr. Taylor, Taylor's mother, and M.W.'s mother before imposing its sentences in each case. The trial court sentenced Taylor to an aggregate prison sentence of five to six years after running Taylor's sentences on the underlying offenses from all three cases concurrent to one other. Taylor's

aggregate sentence was broken down as follows:  In Cuyahoga No. CR-23-678331, the trial court imposed a mandatory prison term of three years on the firearm specification to be served prior and consecutive to a prison term of two to three years on the underlying offense on amended Count 1, and 18 months on amended Count 6.  In Cuyahoga No. CR-23-678332, the trial court imposed a prison term of two to three years on amended Count 3 and 18 months on Count 8.  In Cuyahoga No. CR-23-683391, the trial court imposed a prison term of 18 months on Count 1 and six months on amended Count 3.  The trial court also imposed postrelease control and advised that Taylor received 293 days of jail-time credit, running concurrent with each case.

{¶ 29} Taylor appealed, raising two assignments of error for review.

**Assignment of Error No. 1**

The juvenile court abused its discretion when it determined that [Taylor] was not amenable to treatment in the juvenile court system, in violation of R.C. 2151.12(B); Fifth and Fourteenth Amendments to the U.S. Constitution; Article 1, Section 10, Ohio Constitution; and *State v. Nicholas*, 2022-Ohio-4276.

**Assignment of Error No. 2**

The juvenile court committed plain error when it transferred misdemeanor offenses for adult criminal prosecution, and when it accepted waivers of probable cause and amenability hearings premised on a misstatement of law, in violation of R.C. 2152.10 and 2152.12; *State v. D.W.*, 2012-Ohio-4544; the Fifth and Fourteenth Amendments to the U.S. Constitution; and Article I, Section 16 of the Ohio Constitution.

## II. Law and Analysis

### A. Effect of Taylor's Guilty Plea

{¶ 30} As preliminary matter, we address the State's argument that Taylor waived any alleged appealable errors by entering a guilty plea. The State claims that Taylor cannot challenge the juvenile court's amenability determination or transfer of his misdemeanor charges because the alleged errors do not implicate jurisdictional issues and each of the counts were supported by probable cause. Taylor counters that the juvenile court's amenability determination is independent of factual guilt and "a key ingredient in the discretionary transfer of the juvenile court's exclusive subject matter jurisdiction."

{¶ 31} Here, Taylor's assignments of error do not challenge the evidentiary bases for the juvenile court's probable-cause determinations; rather, they involve alleged defects in the juvenile court's discretionary transfer proceedings that are unrelated to Taylor's factual guilt and contemplate the lawfulness of Taylor's bindover. This court recently explained:

> While a defendant, when entering a guilty plea in adult court, admits committing the acts that constituted the offenses to which he pleads guilty (and which were the subject of the juvenile court's probable-cause determination), he does not make any admission . . . that he was not amenable to care or rehabilitation in the juvenile justice system.

*State v. D.T.*, 2024-Ohio-4482, ¶ 76 (8th Dist.).

{¶ 32} Moreover, this court has repeatedly declined to reach the State's broad conclusion that there is "'a definitive, bright-line rule that an offender waives all non[-]jurisdictional errors in the juvenile proceedings after the case is transferred

to the general division if the offender pleads guilty to the felony offenses.'" *D.T.* at ¶ 78, quoting *State v. Pickens*, 2024-Ohio-951, ¶ 78 (8th Dist.), citing *State v. Jordan*, 2023-Ohio-311 (8th Dist.). Without determining the jurisdictional nature of the issues raised by Taylor, we note that similar challenges to a juvenile court's amenability findings and discretionary transfers have been considered on appeal following a defendant's guilty plea in the general division. *See, e.g., D.T.* at ¶ 79-80 ("We do not believe a defendant must choose to go to trial, rather than enter a guilty plea, in order to preserve his or her right to challenge errors in the juvenile court's . . . amenability determination."); *State v. Bryant*, 2024-Ohio-1192 (2d Dist.) (following the defendant's guilty plea in the general division, the appellate court considered (1) whether the juvenile court abused its discretion when determining that the defendant was not amenable to further juvenile justice system interventions and (2) whether the defendant's misdemeanor offenses were subject to bindover.)

{¶ 33} Accordingly, we decline to find that Taylor's guilty pleas in the general division preclude us from reviewing his assignments of error challenging the juvenile court's amenability determination and transfer of his misdemeanor offenses.

**B. Juvenile Court's Amenability Findings**

{¶ 34} In his first assignment of error, Taylor argues that the juvenile court abused its discretion when it determined that he was not amenable to treatment in the juvenile court system.

{¶ 35} Juvenile courts have jurisdiction over children alleged to be delinquent for committing acts that would constitute a crime if they were committed by an adult. R.C. 2151.23. However, under certain circumstances, a juvenile may be subject to a mandatory or discretionary transfer from the juvenile court to the general division for criminal prosecution. R.C. 2152.12(A) and (B). In a discretionary transfer proceeding, the juvenile court may transfer the child to adult court for prosecution if it finds (1) that the child was at least 14 years old at the time of the charged act; (2) there is probable cause to believe that the child committed the charged act; and (3) "[t]he child is not amenable to care or rehabilitation within the juvenile system, and the safety of the community may require that the child be subject to adult sanctions." R.C. 2152.12(B). In making the amenability determination under R.C. 2152.12(B), the juvenile court must weigh the statutory factors favoring transfer in R.C. 2152.12(D) against the statutory factors disfavoring transfer in R.C. 2152.12(E) and indicate on the record the specific factors it weighed in making its determination. R.C. 2152.12(B)(3).

{¶ 36} In addition to "any other relevant factors" for and against transfer, the statutory factors that a juvenile court must consider "in favor of transfer" include:

(1) The victim of the act charged suffered physical or psychological harm, or serious economic harm, as a result of the alleged act.

(2) The physical or psychological harm suffered by the victim due to the alleged act of the child was exacerbated because of the physical or psychological vulnerability or the age of the victim.

(3) The child's relationship with the victim facilitated the act charged.

(4) The child allegedly committed the act charged for hire or as a part of a gang or other organized criminal activity.

(5) The child had a firearm on or about the child's person or under the child's control at the time of the act charged, the act charged is not a violation of section 2923.12 of the Revised Code, and the child, during the commission of the act charged, allegedly used or displayed the firearm, brandished the firearm, or indicated that the child possessed a firearm.

(6) At the time of the act charged, the child was awaiting adjudication or disposition as a delinquent child, was under a community-control sanction, or was on parole for a prior delinquent child adjudication or conviction.

(7) The results of any previous juvenile sanctions and programs indicate that rehabilitation of the child will not occur in the juvenile system.

(8) The child is emotionally, physically, or psychologically mature enough for the transfer.

(9) There is not sufficient time to rehabilitate the child within the juvenile system.

R.C. 2151.12(D). The statutory factors that a juvenile court must consider "against a transfer" are:

(1) The victim induced or facilitated the act charged.

(2) The child acted under provocation in allegedly committing the act charged.

(3) The child was not the principal actor in the act charged, or, at the time of the act charged, the child was under the negative influence or coercion of another person.

(4) The child did not cause physical harm to any person or property or have reasonable cause to believe that harm of that nature would occur, in allegedly committing the act charged.

(5) The child previously has not been adjudicated a delinquent child.

(6) The child is not emotionally, physically, or psychologically mature enough for the transfer.

(7) The child has a mental illness or intellectual disability.

(8) There is sufficient time to rehabilitate the child within the juvenile system and the level of security available in the juvenile system provides a reasonable assurance of public safety.

R.C. 2151.12(E). This court has held that "[n]o one factor under R.C. 2152.12(D) or (E) is outcome determinative" and the statutory analysis is satisfied if the trial court concludes, by a preponderance of the evidence, that the factors in favor of transfer outweigh those against transfer. *Jordan*, 2023-Ohio-311, at ¶ 11 (8th Dist.), citing *State v. Nicholas*, 2022-Ohio-4276, ¶ 35.

{¶ 37} An appellate court reviews a juvenile court's amenability determination under an abuse-of-discretion standard. *In re M.P.*, 2010-Ohio-599, ¶ 14. A trial court abuses its discretion when its decision is unreasonable, arbitrary, or unconscionable. *State v. Hill*, 2022-Ohio-4544, ¶ 9, citing *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). So long as the juvenile court considers the appropriate statutory factors and the record provides a rational and factual basis to support its decision, the juvenile court's amenability determination cannot be reversed, regardless of our personal views of the evidence. *State v. Nicholson*, 2022-Ohio-2037, ¶ 206 (8th Dist.), citing *State v. Crosby*, 2019-Ohio-2217 (8th Dist.). Nor is a defendant's disagreement with the way the juvenile court weighed the factors a reason to reverse the court's amenability decision. *Jordan* at ¶ 12, citing

*State v. Cunningham*, 2022-Ohio-3497, ¶ 100 (6th Dist.), *State v. Ramsden*, 2021-Ohio-3071, ¶ 23 (12th Dist.), and *Nicholas* at ¶ 73.

{¶ 38} In this case, the juvenile court weighed the statutory factors for and against transfer, as required by R.C. 2152.12(D) and (E), and indicated on the record the specific factors that it weighed. After a full investigation (including Dr. Williams' psychological examination of Taylor) and consideration of Taylor's prior juvenile record, family environment, school record, and previous efforts for treatment and rehabilitation (including prior commitments to the Department of Youth Services, the nature and severity of the offenses, the age, physical, and mental condition of the victims, and other matters of evidence), the juvenile court found that seven of the nine R.C. 2152.12(D) factors favoring transfer applied: (1) the victim suffered harm as a result of the alleged act; (3) Taylor's relationship with the victim facilitated the act charged; (5) Taylor possessed a firearm during the commission of the act; (6) Taylor was awaiting adjudication in one juvenile case and under community-control sanctions in two other cases at the time of the act charged; (7) the results of any previous juvenile sanctions and programs indicated that rehabilitation would not occur; (8) Taylor was emotionally, physically, and psychologically mature enough for transfer; and (9) there was insufficient time to rehabilitate Taylor in the juvenile justice system. The juvenile court specifically referenced Taylor's other juvenile court cases and his completion of a gun intervention program and indicated at the amenability hearing that "by getting involved in this offense, it's clear that the results

of previous juvenile sanctions and programs indicate that rehabilitation will not occur in the juvenile system."

{¶ 39} The juvenile court also acknowledged that it considered the R.C. 2151.12(E) factors and found that three "other relevant factors" disfavored transfer, specifically Taylor's age, "tremendous family support," and "appropriate" behavior in the juvenile detention center. During the amenability hearing, the juvenile court provided further explanation regarding its finding that there was insufficient time to rehabilitate Taylor in the juvenile system "based on the above," which included its weighing of factors for and against transfer and commentary regarding teachings from the gun intervention program and Taylor's subsequent choice to "exacerbate" the "crazy situation" rather than remove himself from it, despite having "ample time" to do so. Based on its weighing of the delineated seven factors for transfer and three factors against transfer, the juvenile court concluded that Taylor was not amenable to care or rehabilitation within the juvenile system and the safety of the community may require that he be subject to adult sanctions.

{¶ 40} On appeal, Taylor's arguments are limited to the trial court's findings that rehabilitation would not occur in the juvenile justice system and there was insufficient time to rehabilitate Taylor. Specifically, Taylor argues that it was unreasonable for the juvenile court to find that he was not amenable to treatment in the juvenile court system absent (1) discussion of the services available, (2) explanation as to why those services would not benefit Taylor, and (3) basis for why five years in the juvenile court system was insufficient to rehabilitate him. Taylor

claims that he was never given a full opportunity to partake in long-term, consistent treatment programs and that the record demonstrates that he was amenable to untested juvenile court services and sufficient time remained for rehabilitation. Taylor cites to *State v. D.H.*, 2015-Ohio-3259 (2d Dist.), and *State v. Carter*, 2023-Ohio-4310 (8th Dist.), in support of his argument. However, both cases are distinguishable.

{¶ 41} In *D.H.*, the Second District found that it was unable to review the amenability decision because the "[t]he juvenile court's entry under review contain[ed] insufficient factual findings to identify how the court reached its conclusion that D.H. could not be rehabilitated in the juvenile system." *D.H.* at ¶ 17. The Second District later explained:

> In *D.H.*, our inability to review the juvenile court's amenability determination stemmed in large part from the fact that D.H. had no prior history in the juvenile justice system. The juvenile court had information that D.H. had a poor school attendance record, which ultimately resulted in his expulsion, but there was no indication that the juvenile court had information about how those behaviors and punishments would translate to the services and sanctions available through the juvenile court. Neither the psychologist's report nor the juvenile court entry discussed any of the programs or structure available in the juvenile justice system that could address D.H.'s needs, and the psychologist made no recommendation as to whether D.H. could be rehabilitated in the juvenile justice system.

*State v. Ferguson*, 2017-Ohio-7930, ¶ 32 (2d Dist.). Unlike D.H., Taylor did have prior history in the juvenile justice system and was under community-control sanctions at the time of the offenses. Moreover, Dr. Williams' report provided substantial details about Taylor's family, academic, developmental, legal, and social

histories. The report also discussed Taylor's results from intellectual and psychological testing and the programs and interventions that could benefit him. Finally, Dr. Williams' report included Taylor's scores on "three key transfer factors," which indicated (1) a moderate risk for future violence; (2) a high range of sophistication and maturity, which Dr. Williams concluded Taylor was using primarily in antisocial ways; and (3) a moderate estimate that Taylor could obtain a positive treatment outcome due to a combination of favorable and unfavorable characteristics. Therefore, the record provides sufficient detail to allow us to conduct a meaningful review.

{¶ 42} In *Carter*, the evidence presented at the amenability hearing demonstrated that each of the services offered to the defendant had never begun or been completed, through no fault of his own. *Carter* at ¶ 22. As a result, we held that the juvenile court's conclusion that there was "nothing left" for the defendant in the juvenile system was unsupported by the record. *Id.* at ¶ 23. Here, certain referrals and recommendations were not completed, seemingly due to instability within Taylor's mother's home. However, the juvenile court did not conclude that there was "nothing left" for Taylor in the juvenile justice system; rather, it concluded that the general division was a more appropriate avenue to address Taylor's conduct because his prior involvement in the juvenile court system, ongoing community-control sanctions, and completed gun intervention program did not deter Taylor from getting involved in subsequent firearm offenses. This finding is supported by the record.

{¶ 43} Indeed, the potential availability of a dispositional option does not affect the weighing of factors for and against transfer; rather, "[t]he focus remains on whether the juvenile system can help the juvenile, not on what sanction the juvenile court can impose." *Nicholas*, 2022-Ohio-4276, at ¶ 39 (holding "a juvenile court need not consider all potential juvenile dispositions, including a serious-youthful-offender disposition, when balancing the factors weighing in favor of and against transfer"). Nor is the juvenile court "'required to individually analyze each and every possible avenue for juvenile rehabilitation and decide that [the juvenile] was not amenable to them.'" *D.M. v. D.M.*, 2017-Ohio-8768, ¶ 50 (6th Dist.) quoting, *State v. Curtis*, 2016-Ohio-6978, ¶ 50 (3d Dist.).

{¶ 44} Here, the juvenile court considered Taylor's full investigation and the evidence presented at the amenability hearing; weighed the statutory factors for and against transfer, including Taylor's age, family support at the time of the amenability hearing, and improved behavior in the juvenile detention center; determined that the factors favoring transfer outweighed those disfavoring transfer; and exercised its discretion to bind over Taylor. While Taylor may disagree with the way in which, the juvenile court weighed these factors, his disagreement alone is insufficient to show that the trial court's statutory findings amount to an abuse of discretion. Nor can the juvenile court's amenability determination be reversed based on our personal views of the evidence. Because the record provides a rational and factual basis to support the juvenile court's amenability decision, we cannot say that the

juvenile court abused its discretion by transferring Taylor's cases to the general division. Accordingly, Taylor's first assignment of error is overruled.

## C. Transfer of Misdemeanor Offenses

{¶ 45} In his second assignment of error, Taylor claims that the juvenile court committed plain error when it transferred his misdemeanor offenses for adult criminal prosecution and accepted waivers of probable cause and amenability hearings premised on a misstatement of law. Taylor argues that bindover procedures only apply to felony-level offenses and the juvenile court unlawfully transferred two misdemeanor charges amongst the 11 felony charges associated with Cuyahoga Juvenile Division Nos. DL22110100 and DL23108412. Taylor further contends that his probable cause and amenability hearing waivers were not knowingly, intelligently, and voluntarily entered in Cuyahoga Juvenile Division No. DL23108412 because no distinction was made between Taylor's felony charges and misdemeanor charge during the juvenile court's colloquy. Taylor acknowledges that defense counsel did not object to these purported errors.

{¶ 46} When Taylor was charged in Cuyahoga Juvenile Division No. DL22110100, R.C. 2152.10(B) (effective July 5, 2002) provided that "if a child is fourteen years of age or older at the time of the act charged and if the child is charged with an act that would be a felony if committed by an adult, the child is eligible for discretionary transfer to the appropriate court for criminal prosecution." The current version of the statute, amended prior to Taylor being charged in Cuyahoga

Juvenile Division No. DL23108412, states that the "child's case" is also eligible for transfer under those circumstances. R.C. 2151.10(B) (effective April 4, 2023).

{¶ 47} R.C. 2152.12 was similarly amended. The prior version of the statute provided for discretionary transfer *of a case* under certain circumstances following a hearing "after a complaint has been filed alleging that a child is a delinquent child for committing an act that would be a felony if committed by an adult . . . ." R.C. 2152.12(B) (effective Oct. 12, 2016). The current version of the statute was amended to provide for discretionary transfer *of a case* under the same circumstances: "after a complaint has been filed alleging that a child is a delinquent child *by reason of committing one or more acts that would be an offense* if committed by an adult and *if any of those acts* would be a felony if committed by an adult . . . ." (Emphasis added.) R.C. 2152.12 (effective April 4, 2023). However, we need not interpret R.C. 2152.10 and 2152.12 or the legislative intent behind the statutes and amendments to dispose of Taylor's second assignment of error.[3]

---

[3] We note that the Second District recently addressed the issue of whether misdemeanors, when combined with felonies, can be transferred from juvenile court to adult court. *See Bryant*, 2024-Ohio-1192. In *Bryant*, the Second District concluded that the legislature intended that an entire case, including all felony and misdemeanor charges, be transferred to adult court once probable cause is found. *Id.* at ¶ 25-27. The Second District further noted that "even putting aside the clear statutory indications that misdemeanors can be transferred to adult court, Ohio case law is replete with examples of this same scenario." *Id.* at ¶ 28, citing *State v. Smith*, 2022-Ohio-274, ¶ 11 (juvenile court found probable cause for both felonies and misdemeanor and transferred all to adult court), *State v. Jones*, 2022-Ohio-1169, ¶ 3-4 (8th Dist.) (juvenile court found probable cause for both felonies and misdemeanors and transferred the case to the general division), and *State v. Watkins*, 2018-Ohio-46, ¶ 2, 6 (12th Dist.).

{¶ 48} Crim.R. 52(B) provides that "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." Because Taylor did not object to the transfer of his misdemeanor offenses or the juvenile court's colloquy during the bindover proceedings, he waived all but plain error and bears the burden of establishing that error on appeal. *State v. Bond*, 2022-Ohio-4150, ¶ 7 ("The main distinction between plain-error review, which is the standard employed when a defendant failed to object at trial, and harmless-error review, which is employed when a defendant did object, is the party that bears the burden."). Under the plain-error standard, the defendant must show that "'but for a plain or obvious error, the outcome of the proceeding would have been otherwise, and reversal must be necessary to correct a manifest miscarriage of justice.'" *State v. West*, 2022-Ohio-1556, ¶ 22, quoting *State v. Quarterman*, 2014-Ohio-4034, ¶ 16.

{¶ 49} Here, Taylor was not convicted of any of the transferred misdemeanor offenses — those counts were nolled in exchange for his guilty pleas to felony counts in the same cases. Even if we assume that the juvenile court erred in transferring Taylor's misdemeanor charges and/or failing to distinguish them in its colloquy, Taylor has not demonstrated how those errors impacted his convictions. Nor has Taylor established that reversal is necessary to correct a manifest miscarriage of justice. Because Taylor has not shown that but for the alleged errors, the outcome of the proceedings would have been different, we decline to find plain error. Accordingly, Taylor's second assignment of error is overruled.

{¶ 50} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, juvenile division, to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EMANUELLA D. GROVES, JUDGE

EILEEN A. GALLAGHER, P.J., and
SEAN C. GALLAGHER, J., CONCUR